COCKRELL *v.* STATE.

(In Banc.   June 8, 1936.)

[168 So. 617.   No. 32218.]

**McKeigney & Latham,** of Eupora, for appellant.

**Wm. H. Maynard,** Assistant Attorney-General, for the state.

Argued orally by **A. F. McKeigney,** for appellant.

**McGowen, J.,** delivered the opinion of the court.

The appellant, Zack Cockrell (colored), on an indict-ment charging him with the murder of one Ed Wilson, a white boy about sixteen years old, was tried and con-victed in the circuit court of Grenada county and sen-tenced to be hanged, from which sentence he appeals here. He was indicted in Webster county where the homicide occurred, and was granted a change of venue to Grenada county.

On October 20, 1935, Ed Wilson came to the home where he was living with his stepfather at about eleven o'clock, ate his dinner, and in a short time left the house "in good spirits," and was not seen alive again. No alarm was felt in the household upon his failure to return home at dark, but at about ten o'clock that night Mr. White, Wilson's stepfather, became alarmed and instituted a search for him in the neighborhood. At about six o'clock that evening, a house known as the

Hartley house, in which Mr. White kept hay, was discovered to be in flames, and at eleven o'clock that night, the Hartley house having been destroyed by the fire, a charred body, identified as that of Ed Wilson, was found in the ruins of the burned house. There were three wounds on his head, two of which had broken the skull, and a hammer fitted in these wounds.

The father-in-law of Zack Cockrell testified that the appellant, accompanied by his wife, Mary Jane Cockrell, came to the home of the witness about eleven o'clock that Sunday night, slept in the bed with his little boy, and on the following day went to the mill; that Zack Cockrell told him, the father-in-law, that he had killed Ed Wilson with a hammer and had thrown his body in the Hartley house where the hay was stored.

On Tuesday, the appellant was arrested at Montpelier, ten or fifteen miles from the scene of the homicide, and was, by the sheriff of Webster county, incarcerated in the jail at Aberdeen in Monroe county, where the appellant made a free and voluntary confession, a day or two after he had been in this jail, to Joe Morgan, sheriff of Monroe county; A. W. Suggs, sheriff of Webster county, and three other witnesses, all officers, which confession, according to Morgan, was as follows: "He said that he missed Mary Jane—that was his wife—from the house, that he got his hammer and put it in his pocket and went out to look for her; that he saw her going across the field approaching—said he had a few rows of potatoes and she was approaching this potato patch; he followed her on and thought probably she would stop there but she didn't, she proceeded on and he followed her over to what he called the Hartley house, or near the Hartley house; that he found her there with Ed and he approached them; they were in an act of sexual intercourse, and as he came up he exclaimed 'Hup,' and called Ed a white ——; Ed called him a black ——, and reached for a brick; when he did he struck him with

the hammer; that Ed made some sound and he struck him twice more with the hammer; he then with Mary Jane took Ed to the Hartley house, put his body up in the window, his head inside and his feet out; Mary Jane balanced him in the window until he went around and went inside, when he dragged him on in the house; that there was some hay in the house—it was unoccupied, it was a dwelling but unoccupied, and had some hay in it; he first stated that he must have dropped his cigarette; that he lit a cigarette in there and he must have dropped his cigarette that set the hay on fire; he later said that he pulled some hay up on him and that he dropped the match. I don't think he said he struck the match to him, just dropped the match in the hay.'' He was asked, ''Q. Did he tell you where he went after he killed him? A. He went back to the house and gave Mary Jane a little, I forget how he expressed it,—a little brushing, and I questioned him as to what he did. He said he went back to the house, and the expression he used, I didn't quite understand, he finally said he hit her with his open hand, his bare hand. . . . He went to some other negro's house and spent the night, I don't recall just now the name of the negro he gave, but then other details with reference to what he did after the killing, I do not recall definitely.'' This witness was subsequently recalled by the state, and testified further that appellant told him, when asked why he had the hammer, that ''he got it to fight with.''

The only other witness who testified as to this same confession was A. W. Sugg, sheriff of Webster county, who stated as follows: ''He said on the Sunday morning before the killing, before this happened, that he went away from home; he came back home about four o'clock in the afternoon . . . and Mary Jane fixed his supper, and while he was eating supper Mary Jane slipped out and he said he missed her and noticed she had slipped out, and he watched her and she was crossing

the road towards the potato patch, and he thought maybe she was going to get some potatoes, but when she passed the potato patch he said he slipped the hammer in his left hip pocket of his overalls and followed her, and he followed her across Mr. White's farm to the Hartley place, and when he got there . . . he found her with this Wilson boy." "And he said when he came up on them that they were having intercourse and that Wilson jumped up and that he struck him with a hammer."

The evidence discloses that Cockrell followed his wife to the scene of the homicide, some one-half to three-fourths of a mile. The testimony given by Suggs does not disclose any mention of any epithets, nor that appellant said he carried the hammer to fight with, nor that Wilson had tried to secure a brick.

These versions of the same confession made by the appellant in the jail constitute the only account of the killing, and are, therefore, the only facts which the jury had upon which to predicate a conviction.

The court granted to the state the usual instructions which authorize a conviction for murder, and also granted to the appellant manslaughter instructions to the effect that if the appellant came upon his wife and the deceased while they were engaged in an act of sexual intercourse, it was the duty of the jury to find the appellant guilty of manslaughter.

The appellant requested the general charge to the jury that appellant was not guilty, which was refused, and the court likewise refused an instruction for the appellant reading as follows: "The court instructs the jury to find the defendant guilty of manslaughter."

On the motion of the appellant for a new trial, one ground of which was, "Because the uncontradicted evidence shows that the defendant is not guilty of murder," the court entered an order overruling same.

The main assignment of error which we shall consider here is that the appellant, on undisputed evidence, was

not guilty of murder. The appellant is convicted on his own version of the facts, and we are of the opinion that the jury in this case was not authorized in finding the appellant guilty of murder, under the decisions of this court and in other jurisdictions. In the case of Reed v. State, 62 Miss. 405, it is said, "If he [defendant] had caught the offender in the act of adultery with his wife and had slain him on the spot, the crime would have been extenuated to manslaughter—such provocation in legal contemplation being sufficient to produce that brevis furor which for the moment unsettles reason."

In the case of Rowland v. State, 83 Miss. 483, 35 So. 826, 827, 1 Ann. Cas. 135, this court declared that the doctrine announced in the Reed case, supra, was recognized as a rule at common law. The facts in the Rowland case were that the appellant and his wife were on good terms, the wife living with Lou Pate, and appellant visiting her each week or every two weeks. In the front room were two beds—one occupied by Lou and her husband, and the other usually occupied by Becky Rowland. In the back room there was one bed. Appellant, on the night of the killing, reached the Pate home and discovered Thorne's horse hitched to the rack, and heard a man and woman talking in the back room. Listening he found out that Thorne and Becky Rowland were in the back room, and he heard Thorne say, "Make haste," which aroused his suspicion, and he attempted to open the back door of the room, and it being latched he went to the front door, pushed it open, went into the room, and, by the dim light burning at the foot of their bed, he saw Lou Pate and her husband in bed asleep. He stepped through the partition door into the back room and discovered his wife and Thorne in the very act of adultery. They sprang up and both rushed by him into the front room, his wife blowing out the lamp as she passed the foot of the bed. Appellant fired at Thorne,

and killed Becky Rowland, his (appellant's) wife. Lou Pate, the only eyewitness, corroborated the story of appellant. In that case the lower court gave an instruction authorizing the jury to convict for murder. This court, after a discussion of the rule announced in the Reed case, supra, and authorities sustaining the rule at common law in other jurisdictions, had this to say, ''Making an application of the foregoing principle of law to the case at bar, we find that the conviction for murder was not warranted by the facts, and cannot be sustained. In some jurisdiction, homicide under the circumstances disclosed by this record is held to be justifiable; and we have been unable to find any decision of a court of last resort, which, in the absence of express statute, upheld a conviction for murder under similar facts. Accepting the story of the state's witness as absolutely true, deceased and Thorne were surprised by appellant under such conditions and amid such surroundings as to demonstrate with absolute certainty that they were then actually committing adultery. This fact alone, in legal contemplation, is adequate provocation to reduce the grade of the homicide, if then instantly committed, from murder to manslaughter,'' citing Price v. State, 18 Tex. App. 474, 51 Am. Rep. 322, 323, and numerous citations. and 20 Leviticus, 10.

''From an extended examination of the authorities bearing on. this question, we conclude that there was no testimony upon which to base the second instruction granted for the state, as hereinbefore quoted. There are no facts disclosed by this record to warrant the jury in finding that appellant acted from a 'deliberate design to effect the death of the person killed.' The law, from the earliest ages, recognizing and considering the passions and frailties of man, in its mercy, has said that deliberation cannot be predicated of the deeds of a man situated as was the appellant at the moment of the homicide.''

The attorney-general frankly admitted that the case at bar is perilously close to the rule in the Rowland case, but argued that it was a question for the jury as to whether or not there was premeditation, or that the killing occurred as a result of passion engendered by the acts of the appellant's wife and her paramour, and that no cooling time occurred before the killing, and in support of his position argued that appellant secured a hammer to fight with.

There is no evidence of what suspicion was aroused in the appellant's mind as to the conduct of his wife when he followed her.

The attorney-general argued further that in the confession the appellant did not state that his passion was aroused because of Wilson's conduct, and that when he stopped his wife and Wilson were committing adultery, and that Wilson secured a brick. There is no evidence that Wilson undertook to use a brick. The evidence is conclusive that Cockrell immediately killed his wife's paramour when he discovered her committing adultery. He argued further the cruelty of destroying the body of Wilson by fire.

The appellant, a man of one color, discovered his wife in the act of adultery with a man of another race. Laying all emphasis upon the fact that appellant said in his confession that he carried the hammer to fight with, in our opinion, this did not differentiate this case from the Rowland case, where the appellant's suspicions were aroused, and with a deadly weapon he shot to kill, and this court said that the crime was manslaughter.

In the case at bar there is no evidence that appellant had the slightest suspicion that his wife was leaving home for the purpose of engaging in the act of adultery with Wilson or with any man, and the fact that he discovered his wife and the deceased in the act of adultery, under the circumstances, was adequate provocation to

reduce the grade of homicide from murder to manslaughter.

The only evidence in this case is that the appellant says he killed the deceased with a hammer, and however cruel may have been the treatment of the dead body, in this case, the appellant is being tried for an act which effectuated the death of the deceased, and not for what he did with the lifeless body. So far as burning the body is concerned, it may or may not be that the enormity of the offense to him and his household, presumably, aroused his passion to such pitch that it did not, at once, abate, and it is just as logical to argue that the act of burning the body was but a continuation of his aroused passion because of the adultery of his wife which he had seen.

We do not mean to hold that the mere fact that an offended spouse comes upon the other in the act of adultery, and kills one or both of them, would reduce the crime from murder to manslaughter in all cases, nor would it be a license to murder. The facts and circumstances of each case are to be considered. This court said, in the case of Hughey v. State, 106 So. 361, 362, that, "The mere fact alone that the appellant saw the deceased and her husband engaged in such conduct would not reduce the crime to manslaughter unless it had the effect of arousing the angry passions of the mind to such an extent as to overthrow reason." However, in that case this court said that the statements of the accused and her husband, as to the act of adultery, were unreasonable, and that while the instruction there for the state was faulty in failing to embrace the theory of sudden passion, the omission did not warrant a reversal. The court there was of the opinion that the alleged adultery did not occur. The facts of other cases cited, and especially the case of Shufflin v. People, 62 N. Y. 229, 235, 20 Am. Rep. 483, are easily differentiated from the case at bar.

Evidence as to the corpus delicti does not leave that question in doubt. The body was positively identified, as were also the wounds in the head as such, and the body was found in the house in which hay was stored. The blows on the head made with a hammer could not have been self-inflicted.

The conviction of the appellant for murder cannot be upheld. The grade of the offense was no greater than manslaughter. The court below erred in not granting appellant a new trial.

Reversed and remanded.